May it please the Court, my name is Cornelia Dye, appearing on behalf of the appellants. I'd like to reserve three minutes for rebuttal, if that's okay. Just look at the clock in front of you, and whatever time you've got left when you sit down is yours. Okay, thank you, Your Honor. Without waiving any arguments addressed in the briefs, I will focus on why the District Court was wrong in concluding that the confidential policymaking exception applied, and then in concluding that the statute of limitations precluded the claims of appellants Bonneau and Wemmer. The District Court erred in two ways. First, the appellees did not meet their burden of showing that this exception applied. Second, the District Court did not apply a correct analysis to make this determination. This – the commander position is not one contemplated by the Branty Court in recognizing this exception. I'd like to show – I'd like to make the distinction between a commander position and the higher-ranking deputy chief position to whom a commander reports. While a commander position, like lower-ranked police officers, are part of the civil service system, deputy chiefs are not. They are exempt. This indicates that while commanders are subject to the requirements and limitations of the civil service system, deputy chiefs are exempt and may have other requirements as far as the performance of their job. Branty makes – Is that in the record, or is it something we can take judicial notice of? The civil service. The civil – it is in the record, Your Honor. Okay. It is at – in the record at A1032 and A1048. Thank you. And that's part of the L.A. Charter, Your Honor. Here the burden was on the appellees to show that the protected activity here was an appropriate requirement for the effective performance of the commander position. They failed to do so. In Walker, there are nine factors laid out, including the responsibilities, the pay of a commander position, and other factors. In DeRusso, the Ninth Circuit was clear that this is an individualized determination. Thus, the actual duties of the commander position needs to be evaluated. Here, subsequent to the protected activity engaged in by the appellants, which began as early as 2000, there were at least six position – commander positions that were filled and one additional – I'm sorry – five commander positions that were filled and another that was left open. Each of these commander positions should have been examined for the actual duties. As appellants put forth evidence that commander positions differ from one to another and differ based on the assignments given. So there was – there was no determination, proper determination. Let me make sure I understand the basis of your challenge at this point. There are two ways you could be disputing this, and I just want to make sure which one it is. One of them is you could say there are disputed questions of fact, and if you accept our facts, your client's facts, then you'd have to find that these are not policymaking positions. That would be one way of disputing it. The other one, which I think is a situation we'll find ourselves in, I don't think there are very many disputed facts, if any at all, as to what these commanders do. And it becomes more or less a question of law for us to decide, for this court to decide, for us to decide on appeal de novo, whether given sort of the mix of what we know these folks do, whether they are or are not policymaking. Are you in the first category, so the disputed facts category, or are you in the de novo review? You know, we all agree what the facts are, and we have to give an answer as to whether it's policymaking or not. I believe the second category is what we're putting forth here, in that they are not – they are part of the civil service law. Or to put it differently, there are no sort of key disputed facts on what these commanders do. Actually, there are. It is in dispute as far as, for example, their level of policymaking. The appellant, now Commander Tetrault, then Captain Tetrault, testified that commander duties had very little to do with policymaking, for example. So there are tribal issues and material facts, and based on what Nyserk said in Hodler, But some witness saying, oh, yes, they do a lot of policymaking, or no, they don't do a lot of policymaking, that's not a disputed fact. You know, somebody's opinion as to whether somebody is policymaking is not a disputed fact. A question like, you know, do they get to promulgate rules of procedure or policies for when you fire a weapon, you know, that kind of thing would be a fact which would make a difference. But somebody saying, oh, yes, I think this is a policymaking position, that's not a disputed fact. Well, Your Honor, in the record here, there's not a material fact. I mean, it's maybe a fact, but it's not. I understand, Your Honor. Based on the record here, there isn't sufficient evidence to show that they were policymaking. What you've – I don't think – there doesn't seem to be much dispute that they weren't policymaking. I think the allegation was that they advised the chief on policy matters and, therefore, fell within the confidence exception or the prong of that. In other words, that they were part of his intimate personal staff. To glorify secretaries. Actually, that's actually distinguishable here because secretaries, just like in the – I believe the Hobler case, they are conduits of sensitive material. They work closely with their supervisor, whereas here there's not even a direct line between commanders and the chief of police. While they may have some input, there's no evidence in the record that a commander position is of the level that their conduct, their protected conduct, should be an appropriate requirement for the performance of their job. I mean, I think that's – Do you want to talk to us a little bit about the statute of limitations? Yes, Your Honor. The district court just got it wrong here. In Bowman v. Block, NYSERDA was clear that the claims accrue when the – at expiration of the list. Because the party will not know that they are injured. Well, but there has to be a triggering event within the statute of limitations. Just being eligible for promotion is no longer good enough for a continuing violation. You have to have some triggering event. You have to be passed over for a specific job within the period before the statute of limitations expires. What happened in this case? I'm a little confused as to why all three defendants were not treated the same way. Well, that's because Appellant Tatro took the next test for the commander position, and the other two appellants did not. So? For the following year. So. But here, the expiration of – I still don't get it. But so what? I mean, I – You go back one year from the – you go back one year from the filing of the complaint, right? Right. Okay. So you're moving backwards. Was there some hiring for a commander position done within that year going back for which any of these guys are eligible? No, but – no, Your Honor. But there was a position open as of February 6, 2001 through the expiration on June 23. But there was no – but no one was hired for it. They were not passed over for it. They were – there was a position open, but it wasn't filled. But that's an adverse employment action. That was recognized by the Ninth Circuit in the Rodriguez case. That – in that case, it was a discrimination case, and the element that was the adverse employment action was that the position was left open. And here, they did not know they were injured until the list expired. There was a position open. It expired. They still had not been promoted. At that time, they knew that they had been injured. I understand. Why is the expiration of the list a triggering event that would give you – that would – It's only at that time. The claim accrues when the party knows that they're injured. Until the list expired – But they haven't filled the spot. It's not like the spot went to somebody else. It's taken a while to fill the spot. If they want to keep being eligible, they can take the exam again and continue to be eligible. But nothing has happened to them because the spot is open. You know, the employers are not required to fill spots. There could be budgetary constraints. There could be all sorts of reasons why a spot is not filled immediately. Look at the Ninth Circuit, for example. We've had four spots open for a while. You know, we haven't been able to fill them. Your Honor. Despite numerous interviews and all sorts of things. Your Honor, I see my time is almost up. It's okay. It's okay. Just keep talking. In Bowman v. Brock, the analysis of the Ninth Circuit is clear on this point, and that is that the party cannot be certain that they're going to be passed over for promotion off of this eligibility list, this two-year – starting in 1989, this two-year eligibility list. There's no certainty that they're going to be passed over. There's no certainty of injury until the expiration of the list and they've been passed over. I guess what I'm not understanding is why does expiration of the list become a passing over? You just become ineligible. I mean, let's say, for example, in order to be promoted to a certain position, you have to be below a certain age. It sometimes happens. And you pass that age, you know, and the position is not filled. Is the fact that you become ineligible for the position? Or let's say one of them is in for a commander position and gets shot on the job and, you know, sort of injured in such a way that he simply can't be eligible for the position anymore because, you know, can't go out in the field, you know, can't run, you know, whatever the job requires. Why does the fact that the individual becomes ineligible for a position that stayed open become an event, a triggering event for purposes of transaction limitations? He hasn't been turned down. Nothing's happened. Well, in this instance, there is no question of eligibility. The appellees do not dispute that everyone on the list was eligible. Here there's a system of systematic retaliation. And under Morgan, the Supreme Court was clear in stating that when the systematic policy or practice operates within the limitations time period. What Morgan said is discrete acts such as termination, failure to promote, denial of transfer, or refusal to hire are sort of specific triggering events that are easy to identify. And I thought they specifically said that just the passage of time is not enough. What you have to do is have some events, something happen that the employer did that makes the cause of action to accrue. And I don't see how the fact that your client became ineligible is something that can be attributed to the defendants. If they wanted to continue to be eligible, they can take another exam. Different if a position is open, gets filled with somebody else, and at that point they know, no, it hasn't, you know, they can no longer be hired for it. Actually, Morgan addressed discrete acts, but Morgan also addressed systematic policies of discrimination, in this case retaliation. If you look at footnote 9 on page 14, the Court specifically stated it was not addressing claims of pattern and practice, which is what the appellants have alleged here and presented evidence of. Here, this is called under the method of demonstrating continuing violations recognized by Morgan at page 107. And this is a systematic policy which continues to subject the appellants to. Well, let me ask you this. So what about Trotter? I realize the district court didn't hold it that Trotter was Bobby Sessions, but I'm not sure why he's not, why he's not in exactly the same position as whatever the position, the other two plaintiffs are in. Why isn't that Bonneau and Wemmer? Why isn't Trotter in exactly the same position? I'm not certain why the district court – I think the district court got it wrong as far as distinguishing appellants Bonneau and Wemmer in this way because, because the – So if we think that Wemmer and Bonneau were Bobby Sessions limitations and so is Trotter? No, based on – no, actually, based on the district court's reasoning. I realize you don't think that any of them are Bobby, but assuming we rule against you on that and we say that Wemmer and Bonneau are Bobb, doesn't it follow that Trotter is Bobb too? No, because appellant Trotter took the next commander exam, so he remains eligible. Was there anything where he was turned down during this time? Just being eligible is not enough. You have to have a position that's opened and filled with somebody else. Was there such a position? I mean, he got the job. So Trotter got the job, right? After Chief Parks was gone, Your Honor. After Chief Parks was gone, he got the job based on Chief of Police Bratton's appointment. Well, I understand, but so what? I mean, the point is he actually got the job. Was there some other job he could have gotten earlier that he didn't get that somebody else got instead? I guess what I'm trying to say is why does the fact that he is eligible for the position that he takes the exam over again, why does that extend his tax limitations? I'm completely confused by this. Well, our position is that Bonneau and Wemmer's claim did not go into the expiration date. It's not clear from the district court's ruling why the district court didn't address Tetreault other than the fact that he was still eligible based on testing for the next exam. So basically what you're saying, if I understand it, is that Tetreault is no different from them in terms of the spot that was filled. The only difference is that he retook the exam and was eligible. Is that what you're saying? Yes, Your Honor. Okay. And there was no other spot that was open or closed during this time that Tetreault could say he must pass it over for? Just this one position, Your Honor. Just this one position. Right. But there are continuing violations, Your Honor. This is a systematic policy of not boning them to position after position after position.  Thank you, Your Honor. Good morning, Your Honor. My name is Janice Barquist. I am a deputy city attorney representing the City of Los Angeles and Chief Parks. To begin with, I think the record is filled with evidence that the position, that issue, the commander positions, were confidential positions within the terms of this Court's Walker decision. To begin with, it's a very high salary. The commander position pays over $10,000 a month, which is a pretty high salary by police officer standards. These are, in fact, the second-in-command. There's the chief of police and his the first level beneath the chief is the deputy chiefs and under that are the commander positions. There are only second-in-command. You must mean a third-in-command. Excuse me? You must mean a third-in-command, not second. Well, underneath the chief of police is second. Yes, third-in-command. Okay. Excuse me, Your Honor. But it's pretty clear they're not policymakers, isn't it? Excuse me? It's pretty clear they're not policymakers. It's pretty clear that they're not policymakers themselves. Because even your evidence says they're policy implementers. Policy implementers and policy advisors. Right. Not policymakers. That's true, Your Honor. Yes. And certainly they are confidential with regard to the type of relationship they are supposed to have and should have with the chief of police. Indeed, that was a fact that the plaintiffs themselves testified about, that it was very important that the chief of police have confidence and reliability and and I would guess that that's true of the lowest platform and on the beat. Not to the same extent, Your Honor. That the police chief have confidence. You send somebody out into the community with a gun and a baton, you would think that the chief ought to have confidence in that individual, no? I'm not sure what any of this stuff adds to the case. People saying, oh, you know, the chief has to have confidence in his people. It's really sort of a policy question of whether we think that these kinds of jobs or things about which the police chief ought to have unbridled discretion to promote or not promote are basically his cronies. I mean, in the good sense of the word. People that he really likes, that he has confidence with. That would be most remarkable, wouldn't it? For a big city organization to say that people two levels down from the chief, people for whom there is a eligibility exam, you have to take this test, that these are these are confidential assistants of the chief. I don't, I can't, I have a hard time limiting that principle. Well, Your Honor, under the charter of the City of Los Angeles, the appointing authority, in this case the chief of police, has authority to select from among those eligible. There's no dispute that all the people he selected were, in fact, eligible. Because once they get on the list to him, they're all equal. If you're really talking about getting people that sort of have the chief's confidence, you would let the chief just pick people. You wouldn't have the civil service type exam. You just say, you know, you pick whoever is, you know, you don't have a test for the chief's secretary, do we? Yes, I think there is. That is a civil service position. Is it a civil service position?  Well, maybe she's not, then she's not covered. I don't think that's the standard, Your Honor. I assume there's no test for judge's secretary. There, that may be, but there is, there is no evidence. Or if you want to be secretary to the president or, you know, personal secretary to the president or something like that, you know, the president just says it. You know, this is a person I have confidence in. Why? Because, you know, he's dictating memos or whatever that go, you know, contain policy. You want to make sure that there's no, there are no leaks and that these things get properly implemented and his confidence are preserved and if, you know, there are gaps in the record that the secretary will be there and be able to talk about how she put her foot on the pedal. You know, it's all very important. The way the charter is set up, the commander position is a civil service position, but it is specifically written into the charter through the rule of three whole scores that the chief has discretion to select from among those people who are eligible to select those people who he brings his judgment, that in his best judgment are most suited for the position. That doesn't give you anything. It gives him the right to not go straight down the line. No, but that doesn't give you anything at all. It does not, the fact that the chief is given a lot of discretion who to pick doesn't make this a policy position. And it certainly doesn't make it a confidential position. It just means he's given a lot of discretion on whom to pick. If you look at the standards set by this court in the Walker v. Lake, Walker case, and look at the nine criteria they set out, you will find that in the record, almost all of those nine criteria have been met by the commander position in terms of their salary, in terms of. How much more do commanders get than captains? As far as the record reflects. The record does not reflect the captain position. I believe that it's approximately 20,000 dollars a year. Well, your belief is of no consequence. In the record. The record does reflect. So that doesn't help you at all. That factor washes out because you don't have a comparable. So the fact that they get what you say is a lot of money for a policeman counts for nothing. The question is are they getting much more money than the next step down? Actually, it may be in the record, Your Honor. Well. The MOU for captains, I believe, is in the record. But. Well, if you can point us to the record, then. I will have to go back and check that. And if it is in the record, what do you think it says? I believe it's about a 20,000 dollar a year difference between captains and commanders. Is it a lot? Given the talking between commanders are approximately over 120,000 dollars a year, this is a fairly large jump for. How much is it between starting captains and starting lieutenants? I don't know, Your Honor. I don't know. You want us to make these judgments, but there's no way to judge how high is high. Now, look, if you said they get 120,000 and, you know, captain gets 50,000, now that I could tell you without looking at anything else, that's a big gap right there. But I. I think you can look also at some of the other evidence that is also in the record with regard to the responsibilities commanders have for running the organization. There are. Tell us what they do. Go ahead. There was a lot of testimony as to what the job duties of commanders were. Tatro and Bonneau testified that some of the job duties that went across the board among all of the commanders were leadership, integrity, strong work ethic, the strength to do the right thing, and all of these things. Lieutenants and captains are not supposed to have work ethic, are not supposed to do the right thing. Any of those things apply to only commanders and not to anybody else down the chain or sergeants or whatever. The plaintiffs testified. Which of those things apply uniquely to commanders? Is it that captains are supposed to be lazy? No, no. Oh, I'm just asking. Are they not supposed to have leadership qualities? Those are reserved for commanders. They are certainly supposed to have leadership qualities. However, the point of the plaintiff's testimony was that the commanders were supposed to have more of these leadership qualities than the people who were their subordinate officers. Indeed, the evidence is that there are only 18 commanders. Did they say more? I believe they did. Maybe they need less. Maybe the people who are closer to the troops need more leadership qualities. Master Sergeant probably needs more leadership qualities than maybe the lieutenant or the captain. I don't know. I think the record is pretty clear that the leadership qualities necessary to be a commander were those above and beyond what were expected in subordinate officers. As would be a captain. I think in the broader picture what disturbs me about this is that when we think about this type of exception, we're talking a political appointment where you say you have unfettered discretion to hire and fire. Here the discretion is cabined by eligibility requirements. There are other requirements that just seem a little bit different to me, and it's a third-tier position. I appreciate the arguments on the face of the record, but it seems to me that you could make those arguments about a whole host of subordinate positions in government because we expect people to have and enjoy confidence to give advice on policy when asked and so forth. But there's a difference between civil service positions and those in which that are not civil service positions that are true unfettered political appointments, as an example. Well, I don't think that the fact or not fact of being a civil service position is the defining criteria under the Walker case. But if I could move on to the issue of whether or not there's any evidence in the record that the decisions for promotions was being made on the basis of plaintiff's union activity, it is our position that the evidence, there is simply no substantial evidence in the record. I'm sorry. Before you get to that, I just want to make sure I understand the relationship between the two issues. Let's say we were to agree with you that these were policymaking positions or confidential positions. Let's say we were to agree with you. Does that then preclude any First Amendment argument, retaliation argument? Pretty much, Your Honor. Yes. You know, I have read the cases, and I know we have cases that say if it is that kind of position, then you can put in your own person of your own party, let's say, if this were a party office. You won, you get certain spoils of victory, and if these are policymaking positions, you can pick somebody just because he's a Republican, not a Democrat. You know, you're a Democrat, you're out. I want a Republican here. You can also pick somebody because you say, look, I have, if it's a confidential position, I have confidence in this person or in this person, and I'm going to fire this person because they were loyal to the guy I booted out, and that alone is a reason why I want to. That part I understand, but it wasn't clear to me that just having a confidential policymaking position trumps every First Amendment claim, even one that has nothing to do with party affiliation and another one that has nothing to do with confidentiality or anything of that sort. I mean, for example, a straight pickering-type claim. You know, you were in a confidential position, but then you got fired because you go out and you speak on a public issue that the boss simply feels doesn't like, or criticizes the boss publicly. Is it clear that being in a confidential position vitiates your, you know, what I call your pickering claim, pickering-type claim? Well, I don't – I'm not sure that what you're positing is – I don't think that that analogy that you're drawing here is really reflected in this record. This is not a situation – That's why I call these hypotheticals. Well, under that hypothetical, I'm not certain, Your Honor, because this is not a case where anyone has been terminated or demoted or disciplined. Well, give it a try anyway, being certain or not. I'm not asking for certainty. I'm asking you – I think under the – You are an advocate, and so I'm giving you a chance to argue whichever way you think would be most beneficial to your client. If you choose not to because you're not sure, that's okay. I'll make – I'll draw my own conclusion. I don't – But let's say that's what I have in my thinking, contrary to what you hope will be my reading of the record. Do you – does – let's say I agree these guys are confidential, but here they are engaged in these union negotiations. They have nothing – it has nothing to do with their confidential status, nothing to do with their ability to be loyal. It has nothing to do with their ability to be commanders, but they get into this altercation or this battle of wills with the chief on this other thing. Does their being in a confidential position automatically trump any claim that they were being retaliated for First Amendment speech? It depends what kind of retaliation you're talking about, Your Honor. Okay, let's now get to this case. Before you get there, though, doesn't it depend on the type of speech involved? I mean, don't you have to do a Pickering balancing in any event if you get that far? And if it's totally unrelated to the job. Let's say that you have these people and he doesn't like their political party. Well, you – the Pickering balance presupposes that the political activity or the speech had a substantial impact upon what the – what the next step was, what the retaliation actually had. In this case, of course, we – we assert that there's no evidence in the record that the speech or union activity had any impact whatsoever on the decision. Yes, sir. It may very well depend what the – what the protected activity is and what – or what the associational activity is, whether or not that is a matter of public speech. Yes. So, I mean, you have to do that kind of analysis anyway, don't you? Yes. Yeah. I mean, there's not an absolute immunity for people who are in that type of position. In terms of some sort of adverse impact. But when you're talking about a promotional category, I think you're talking a different decision than if you're talking about a disciplinary situation. Because in a disciplinary – Why? Why? Because the standard for discipline is going to be different than the standard for promotion. It certainly is not going to be a criteria – an appropriate criteria to say that just because someone has not been found guilty of malfeasance and been appropriately disciplined, they're therefore the appropriate person to promote. A question of promotion is a far broader category than simply whether or not an individual has been disciplined for some sort of malfeasance. Well, let's just say it's protected speech. That's the assumption. Not this case. But it's clearly protected speech. And the retaliation comes in the form of failure to promote in one case. And in the other case, the retaliation comes in a firing. Is there a difference? Yes. I think there is definitely a difference, Your Honor. Describe how you would articulate the difference. You're saying that you can retaliate. Are you saying that the rule is you can retaliate by failing to promote unprotected speech, just as a general rule? As a general rule, you have to look at the position to which the promotion is being made. Is the promotion being made to a confidential or policymaking position? Then the issue of retaliation is going to drop out. Is it being promoted to a nonpolicy or policymaking position? Then you continue along the Pickering balance test to figure out whether or not the employer has a greater interest in the right being asserted. Is it appropriate for the employer to consider that for this position? Is the position the employee took? Well, I guess, not to interrupt, but is it your – do you believe the rule is that one can't – one may discriminate in promotions to confidential positions, and you may not discriminate as to those positions in terms of termination? I don't think it's quite that easy, Your Honor. I think you have to look at the grounds on which the discrimination or the judgment call is being made. Isn't the question simply whether it's an adverse employment action? Isn't it as simple as that? Well, I don't think failure to promote is an adverse employment action.  You don't think it is? I don't think there is any – This is contrary to what my understanding of the law is, I could imagine. If you're eligible for a promotion and you don't get it, you don't think that counts for Title VII purposes? I think that this Court in New Hampshire does not. For example, this Title VII case, and you think there's a bit of difference between applying for a promotion, not getting it, and getting fired from your current job in terms of the analysis or anything else? Under certain circumstances, perhaps, Your Honor. But under this case, and certainly under this Court's decision in Nunez, the Court held that the failure to promote was not a due process violation, and that individuals do not have due process rights in LAPD's promotional procedures. Okay, but that takes care of the due process argument. And that may be true, given the procedures and protections available as to that particular scheme. And due process is that kind of concept. What process is due depends a lot on what is at stake and what the whole scheme is. But for First Amendment, for retaliation purposes, for Title VII, I've never heard this proposition that a failure to promote is different than a disciplinary action. I mean, I sort of hate to ask you for a citation, but do you have a single case that draws the distinction? I'm not asking you to pull a rabbit out of your hat, but I've just never heard of it. I do not have a case that draws the distinction, Your Honor, because the cases come up in separate.  I will look for it, Your Honor. I'm not telling you. I'm just saying if you go back and you say, oh, you know, I wish I'd followed that case, you know. Okay. By all means, send us a letter. I'd be very surprised to see it. But I think that the point you have to next get to is whether or not there is any evidence in this record that the union activity was one of the bases upon which the promotional decisions were made. And frankly, there is no evidence in the record that that was the criteria. In fact, the evidence in the record is exclusively that Chief Parks was using other criteria, including the recommendations of his deputy chiefs of police. And every deputy chief of police who testified testified that the other candidates selected were more qualified for a variety of reasons than the plaintiffs themselves. So that even if you get beyond the confidentiality. You don't think there's a material issue of fact on the fact that these three guys antagonized Chief Parks? You know, they got in his face in various ways, including the fact that they had bargained pretty hard for the union. And that that was part of the reason, if not the controlling reason, as to why they were thought to be not suitable for promotion. There is no evidence. You don't think that a jury based on this record could find that's what happened? No, I don't think so, Your Honor. The consistent testimony among all of the deputy chiefs, all of whom were raised with the question. Let's say we view the record differently and we say we think that the reasonable jury could find that from the record. And you'd lose on that, right? I'm sorry. I didn't understand the question. Let's say we disagree with you on the assessment of the record. Let's say we look at the record and we say, you know, based on all the evidence, you know, the fact that Tonneau was on the first list and the other two guys were on the second, and they picked people from the first, second, third. You know, this is like seven rungs, right, that went down. And, you know, there's a whole variety of factors that a jury could say, yeah, the reason he didn't pick these guys is he hated those guys for being vigorous, for being really vigorous in their representation of the union. Let's say we look at the record and we think that the jury could come to that conclusion. That would be it, right? You'd lose on that point. Well, I don't think the record would support such a conclusion, Your Honor, because the only evidence of vigorous union activity. Then you could petition for certiorari on that. Let's just assume that that's how we come out. That would be then. I mean, you have no other argument beyond that, right? You have no argument beyond that. If we think that a jury could view the situation like this, as I've described it, then there's no argument past that, that this is positive. Well, no. I mean, there is the statute of limitations argument. I understand. On the substance. In substance as to the decisions Chief Parts made. Yes. The substance. Are you conceding that union negotiations is First Amendment-protected activity? I didn't really see it in your brief, but it wasn't clear at all to me that representing the union is akin to in negotiations is just like going out and speaking to the papers or commenting on the court. Well, I don't think it's at all clear that that is, in fact, the same as typical First Amendment activity of going out and speaking your mind. Because under the Pickering and Mt. Healthy case law, you have to first look at whether the advocacy was of a or the speech was of a public nature or of a private nature. We would – this has not been fully argued in the briefs, but I would argue that the – I think that's an understatement. I would argue that the actions – I think you could leave the word fully out and you would be probably closer to the truth. Well, I would say, Your Honor, that the actions that the plaintiffs took on behalf of the union was more akin to private matters, because whether or not the captains had captain consolidation or merit pay was really not an issue to which the public was particularly interested. And I would also point out that this Court has also ruled that making a decision for promotion based on whether or not the promoted – the eligible candidate was a union director is not in violation of the First Amendment. That, the Court discussed in the Manhattan Beach Police Officers Association. Okay. Thank you. Do you want me to talk? It's cited in your brief. Well, your – I don't believe this is cited in my brief. It was cited in my reply brief to the district court, which is in the record. I see. Well, maybe you should give a supplemental authority to the clerk. Okay. Get a supplemental authority sheet and make sure you give copy to – Do you wish me to address the statute of limitations argument? I think we are out of time. Okay. Thank you, Your Honor. We'll give you a minute. Just quickly. The Bowman v. Block case is directly on point. In that case, a potential female applicant was applying for the sergeant position. She ranked top on the exam, just as the appellants did here. The court expressly found that her claim did not accrue until the expiration of the list. And let me quote from the case. Not until the list expired was it certain that plaintiff would not be promoted. She did not know until that date that she had suffered an injury. And that's just as here, where there's nonappointment to the position, and that is at 1221. And this is directly on point. What's the full citation? Sorry? The full citation. Oh, I'm sorry. It's Block, Bowman v. Block, 940 F. 2nd, 1211, and the pinned citation is 1221. Okay. What date is it? The date? Yes. Ninth Circuit, 1990, Your Honor. Morgan is more recent and is from a higher court. Right. And in Morgan, they recognize the Supreme Court recognized that there is, when there's a systematic policy or practice of discrimination operating within the time limitations, then the time doesn't run. And if there's an act within that time limitation, then the claim is timely. That was followed by the California Court of Appeals in the Valdez v. City of Los Angeles case. But Valdez was 91, which, again, is before Morgan, which is United States Supreme Court 2002. And I'm not sure Valdez survives Morgan, at least for purposes of federal law. Well, for purposes of when you can show a continuing violation, Morgan's clear, and that survives. The only method that Morgan, the Supreme Court did away with in Morgan was when there's a series of related acts. But it still recognized that other than hostile work environment, you can still show continuing violations by showing a systematic policy and practice of discrimination. And here, there was a systematic policy of retaliation by failing to promote depellents time after time during the time period. And, again, I would just point out in the footnote at page 114, footnote 9. Page 114 of what? Of Morgan, of the National Railroad Passenger Court v. Morgan. Yes, we're familiar with it. Judge Lay and I were on the Ninth Circuit panel and got reversed on Morgan. Sorry. At footnote 9, the court expressly. We're a little wary of. At footnote 9, the court expressly stated that it wasn't addressing a case like this. Yes. Which is a pattern. But did it specifically say at page 114 that that termination, I mean, you look at specific acts. What is it in 107 that you think helps you? I believe when. Sorry, Your Honor, I'm going to skip to that part. I mean, what I see. It says, first, a plaintiff may show a series of related acts. And then it says, such a serial violation is established as evidence indicates that. And that is stating that there is no longer. That's in a paragraph that starts in the Ninth Circuit view. I might say, given later events, it might have said in the Ninth Circuit incorrect view, given the outcome of the case. So everything that that is, that is in that paragraph, as I understand it, is laying out the thing they're about to reverse. Right. So saying they said that isn't really quite. Well, I was trying to explain that this is that's a description of the type of method of showing discrimination, that timeliness that is done away with. But if you look at the next paragraph, it addresses the existence of a continuing violation, be it serial or systematic. Yeah. Again, they are continuing to describe the Ninth Circuit's view that this is a positive opinion when they describe the procedural history of the case. And those two paragraphs deal, they are setting up for the slaughter, the view that they're about to reverse and the rest of their opinion. I don't think citing those portions of the opinion will give you much help at all. Well, Your Honor. Because almost by definition, everything they say there are the things they disagree with. Well, also, can I point to at 114. We're familiar with the case, and I think we've taken up enough. Thank you, Your Honor. Okay. Just a minute.
judges: Lay , Kozinski, Thomas